**ESTATE OF Corey HILL, BY Personal Representative Rudolph HILL, Plaintiff–Appellee,**

**v.**

**Christopher MIRACLE, Defendant–Appellant.**

**No. 16-1818**

United States Court of Appeals, Sixth Circuit.

Argued: January 25, 2017

Decided and Filed: April 4, 2017

Rehearing En Banc Denied May 11, 2017

ARGUED: Mary M. Mara, OAKLAND COUNTY CORPORATION COUNSEL, Pontiac, Michigan, for Appellant. Stanley I. Okoli, ROMANO LAW, P.L.L.C., Pleasant Ridge, Michigan, for Appellee. ON BRIEF: Mary M. Mara, OAKLAND

COUNTY CORPORATION COUNSEL, Pontiac, Michigan, for Appellant. Stanley I. Okoli, ROMANO LAW, P.L.L.C., Pleasant Ridge, Michigan, for Appellee.

Before: GILMAN, GRIFFIN, and STRANCH, Circuit Judges.

## OPINION

RONALD LEE GILMAN, Circuit Judge.

This case involves the question of whether a deputy sheriff used excessive force in tasing a combative and disoriented diabetic suffering a hypoglycemic episode in order for the attending paramedics to stabilize his life-threatening condition. The district court denied the deputy's motion for qualified and governmental immunity. For the reasons set forth below, we **REVERSE** the judgment of the district court, and **REMAND** the case with instructions to dismiss the complaint with prejudice.

## I. BACKGROUND

### A. Factual background

In June 2013, Corey Hill suffered a diabetic emergency in his home due to his low blood-sugar level. Paramedics with Star Emergency Medical Service were dispatched to Hill's home at 3:20 p.m. after Hill's girlfriend, Melanie Worrall, called 911 for an ambulance. Two ambulance units and four paramedics, including Luke Streeter, arrived at the home and proceeded to the bedroom where Hill was lying down. Despite finding Hill very disoriented, the paramedics introduced themselves and tried to explain that they needed to check his blood-sugar level. Streeter attempted to prick Hill's finger for this purpose, but an agitated and combative Hill pulled back from the paramedics. Eventually, Streeter managed to prick Hill's finger, leading to the determination that Hill's blood-sugar level was extremely low at 38. A normal blood-sugar range is anywhere between 60 and 110, and a blood-sugar level below that range can cause hypoglycemia. As blood sugar falls, the common effects are for a person to lose consciousness, become combative and confused, or suffer a seizure. A blood-sugar level of 38 is therefore considered a medical emergency and, if left untreated, can lead to prolonged seizure and death.

Deputy Christopher Miracle of the Oakland County Sheriff's Department arrived at Hill's home at some point after Streeter measured Hill's blood-sugar level. As a member of the road patrol, Miracle's duties included responding to calls for emergency medical services. He had encountered over a dozen diabetic emergencies throughout his career and was aware that persons suffering from low blood-sugar levels are often disoriented and unaware of their surroundings. When Miracle arrived, the paramedics were attempting to intravenously administer dextrose to Hill in order to raise his blood-sugar level. Hill became increasingly combative in resisting the paramedics' efforts to insert an IV catheter into his arm.

Streeter was finally able to insert the catheter while the other paramedics held Hill down to the bed. At this point, a completely disoriented Hill swung a fist towards Streeter and ripped the catheter from his arm, causing blood to spray from the open vein. Streeter managed to finally stop the bleeding, but Hill continued to kick, swing, and swear at the paramedics as they tried to hold him down.

Miracle, who at that point had not joined in the attempt to physically restrain Hill, ordered Hill to "relax." When Hill continued to kick and swing, Miracle informed Hill that he (Miracle) was going to use his taser. Miracle then deployed his taser in

drive-stun mode directly to Hill's right thigh.

To use a taser in drive-stun mode, an officer removes the hooks that spring from a taser and holds the device directly against a person's skin. Drive-stun mode is usually not recommended because keeping the taser in contact with a person's skin is difficult, yet necessary to render the taser effective. But Miracle did not want to shoot the hooks of his taser directly into Hill and, in addition, thought that deploying his taser in drive-stun mode was a better option than "hands-on stuff" because Miracle wanted to "minimize [the] damage" and "didn't really know everything that was going on medically." After Miracle held the taser against Hill's thigh for a few seconds, Hill calmed down long enough for Streeter to reestablish the IV catheter and administer dextrose. As noted by Streeter, Hill "became an angel" and was "very apologetic" after the dextrose kicked in.

Streeter then checked Hill's blood-sugar levels and performed an electrocardiogram test. The results of both tests were normal. Hill denied being in any pain at the time, but the paramedics nonetheless transported Hill to McLaren Oakland Hospital, where his care was transferred to Dr. Brian Tweedle. Once again, Hill's blood-sugar level was measured as being within normal range. Medical records from the hospital note a taser puncture wound on Hill's right thigh, but Dr. Tweedle testified that no treatment was rendered for the wound because it was not infected. Hill claims that, as a result of this incident, he suffered burns on his right thigh and that his diabetes worsened.

**B. Procedural background**

Hill filed suit against Miracle in January 2015 in the United States District Court for the Eastern District of Michigan. He brought a claim under 42 U.S.C. § 1983, alleging that Miracle had used excessive force in violation of Hill's Fourth Amendment rights when Miracle deployed his taser. Hill also brought state-law claims of assault and battery and of intentional infliction of emotional distress. In May 2015, Hill died due to complications from his diabetes. The court subsequently entered an order substituting Rudolph Hill as the personal representative of Corey Hill's estate.

Miracle moved for summary judgment on all of Hill's claims in March 2016. The district court granted summary judgment in favor of Miracle on Hill's claim of intentional infliction of emotional distress. But the court denied Miracle's motion for summary judgment on the § 1983 and the assault-and-battery claims. The court held that, based on the facts as viewed in the light most favorable to Hill, Miracle violated Hill's clearly established Fourth Amendment rights in deploying the taser. It therefore denied Miracle's qualified-immunity defense. In addition, the court rejected Miracle's argument that governmental immunity under Michigan law entitled him to summary judgment on Hill's claim of assault and battery. Miracle has timely appealed the court's rulings with respect to both the § 1983 and the assault-and-battery claims.

**II. ANALYSIS**

**A. Standard of review**

■ Our jurisdiction over orders denying qualified immunity is narrow. *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008). "A defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute

a violation of clearly established law." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998). A defendant is therefore "required to limit her argument to questions of law premised on facts taken in the light most favorable to the plaintiff." *Meals v. City of Memphis*, 493 F.3d 720, 726–27 (6th Cir. 2007).

■ Where jurisdiction is appropriate, we review de novo the denial of summary judgment on the basis of qualified immunity. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). We similarly review de novo the denial of governmental immunity under Michigan law when it presents a purely legal question. *Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012).

## B. Miracle's qualified-immunity defense

■■ Qualified immunity shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). This doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

■ Qualified immunity is an affirmative defense. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). The defendant therefore "bears the burden of pleading the defense, but the plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he

or she was under an affirmative duty to refrain from such conduct." *Id.* In other words, "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." *Id.*

■ We ask two questions in evaluating whether a law-enforcement officer is entitled to qualified immunity on an excessive-force claim: "(1) whether the officer violated the plaintiff's constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident." *Kent v. Oakland County*, 810 F.3d 384, 390 (6th Cir. 2016). This analysis can be performed in any order. *Pearson*, 555 U.S. at 236, 129 S.Ct. 808. In analyzing both of these questions, the district court held that Miracle was not entitled to summary judgment on his claim of qualified immunity. We respectfully disagree.

### 1. Miracle did not violate Hill's Fourth Amendment rights.

■ To evaluate whether an officer has used excessive force in violation of the Fourth Amendment, we employ an objective-reasonableness test, asking "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks omitted). We must keep in mind that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. 1865. *Graham* proceeds to set out a three-factor test to aid the courts in assessing objective reasonableness in the typical situation of a law-enforcement officer accused in a civil suit of using excessive force. Those three

factors are: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

 The district court determined that the *Graham* factors "favor a finding that Defendant acted objectively unreasonable when he tasered Plaintiff." *Estate of Corey Hill v. Miracle*, No. 15-CV-10079, 2016 WL 3136066, at *5 (E.D. Mich. June 3, 2016). But applying the *Graham* factors to the situation that Miracle faced is equivalent to a baseball player entering the batter's box with two strikes already against him. In other words, because Hill had not committed a crime and was not resisting arrest, two of the three *Graham* factors automatically weighed against Miracle. The key problem is that the district court tried to apply the *Graham* factors to a completely different factual situation—a medical emergency—where there was no crime, no resisting of arrest, and no direct threat to the law-enforcement officer. In doing so, the court failed to see the forest (the overall standard of objective reasonableness) for the trees (the three factors to use as an aid in assessing objective reasonableness in the typical situation).

We fully sympathize with the district court's dilemma, however, because no appellate court has previously provided any guidance on how to assess objective reasonableness in the present *atypical* situation of a medical emergency. In fact, most of the cases dealing with excessive force and taser use simply hold that an officer does not use excessive force by tasing a person who is actively resisting arrest, but does use excessive force if that person is not resisting arrest. *See, e.g., Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015) ("When a suspect actively resists arrest, the police can use a taser ... to subdue

him; but when a suspect does not resist, or has stopped resisting, they cannot."); *Cockrell v. City of Cincinnati*, 468 Fed.Appx. 491, 495–96 (6th Cir. 2012) (collecting cases) (drawing a distinction between cases where a plaintiff was tased while "actively resisting arrest by physically struggling with, threatening, or disobeying officers" and cases where a law-enforcement officer tases "a plaintiff who has done nothing to resist arrest or is already detained").

The closest case in our circuit is *Caie v. West Bloomfield Township*, 485 Fed.Appx. 92 (6th Cir. 2012), which involved a roughly comparable set of facts. In that case, officers responded to an emergency call from the plaintiff's brother and arrived to find a depressed, intoxicated, and suicidal Caie submerged chest-deep in a lake. In declining the officers' requests to leave the water, Caie "repeatedly told the officers that he wanted to die and asked what he would have to do to get them to shoot him." *Id.* at 94. Caie eventually came out of the water and sat on the ground, but continued to behave erratically, making comments about fighting the police and exhibiting dramatic mood swings. He refused to comply with the officers' requests to transport him to the hospital and so, after several minutes, one of the officers "signaled to the other officers that they were going to have to take physical control of [Caie] in order to transport him to the hospital." *Id.*

Caie began to run and flail his arms violently, but the officers eventually took him to the ground. When Caie refused to move his hands behind his back, an officer applied a taser in drive-stun mode to Caie's back in order to handcuff him. Caie was eventually taken to an ambulance for transport to the hospital. The *Caie* court held that the officer's "single use of the taser in drive-stun mode did not violate Plaintiff's constitutional rights." *Id.* at 96.

In so holding, the court reasoned as follows:

> While it is true that Plaintiff was not being arrested for a crime, his consumption of a large quantity of alcohol and drugs, his erratic behavior, and his self-proclaimed desire to provoke the officers into using deadly force could lead reasonable officers to conclude that he was a threat to officer safety. Plaintiff admits that he was suicidal, meaning that, at a minimum, he was a threat to his own safety. In addition, Plaintiff's attempts to flee—including getting behind the wheel of his car and trying to drive away—undoubtedly posed a risk of harm to others with whom he might come into contact. [The officer] had every reason to believe that, in his highly agitated, suicidal, and intoxicated state, Plaintiff was potentially dangerous.

*Id.*

■ This eminently reasonable decision by the *Caie* court was reached despite the inapplicability of the *Graham* three-factor test. Rather than continuing to struggle with this dilemma, we suggest that a more tailored set of factors be considered in the medical-emergency context, always aimed towards the ultimate goal of determining "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *See Graham*, 490 U.S. at 397, 109 S.Ct. 1865 (internal quotation marks omitted). Where a situation does not fit within the *Graham* test because the person in question has not committed a crime, is not resisting arrest, and is not directly threatening the officer, the court should ask:

(1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?

(2) Was some degree of force reasonably necessary to ameliorate the immediate threat?

(3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

If the answers to the first two questions are "yes," and the answer to the third question is "no," then the officer is entitled to qualified immunity.

These questions and answers serve as a guide to assist the court in resolving the ultimate issue of "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." *Id.* The factors that we establish and apply today are, like the *Graham* factors, non-exhaustive, *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007), and not necessarily dispositive in every case. Nonetheless, these additional considerations aid the ultimate inquiry of "whether the totality of the circumstances justified a particular sort of … seizure," *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1, (1985), and should be considered and ruled upon by the court for claims of excessive force arising in this context.

■ Applying the above factors to the present case, we conclude that, based on the facts as viewed in the light most favorable to Hill, Miracle did not use excessive force against Hill when Miracle deployed his taser in drive-stun mode. As to the first factor, Hill was experiencing a medical emergency and was incapable of making a rational decision due to his hypoglycemic episode. In resisting the paramedics' attempts to save his life, Hill repeatedly kicked his feet and swung his fists in their direction. The paramedics were therefore put in immediate physical danger by Hill's combative actions. In addition, the testimony from Streeter indicates that both the

paramedics and Miracle were at risk due to the blood spraying from Hill's arm. Streeter stated that "[i]f the blood was to spray anybody in the face, get in the mouth, the eye, at this point we don't know the patient, we don't know the history. If the patient had hepatitis C, HIV, there is [sic] a number of things that pose a threat to EMS personnel and the Deputy."

And even if we were to assume that the safety risk from Hill's blood did not justify Miracle's use of a taser, Hill's mental state and combative actions posed an immediate threat to *himself*. Hill's extremely low blood-sugar level was in the hypoglycemic range and, if left untreated, would likely have led to a prolonged seizure and death. Like in *Caie*, therefore, Hill's mental and physical state rendered him "at a minimum, . . . a threat to his own safety." *See Caie*, 485 Fed.Appx. at 95.

■■■ Turning to the second factor, some degree of force was reasonably necessary to ameliorate the immediate threat to the paramedics and to Hill. Because of his hypoglycemic episode, Hill was violently resisting the paramedics' attempts to render him life-saving assistance. The four paramedics were unable to gain physical control over Hill, who had already ripped an IV catheter out of his arm. Hill argues, and the district court agreed, that "any danger could have been eliminated by simply stepping away from [Hill]." *See Estate of Corey Hill*, 2016 WL 3136066, at *5. This proposed action, however, fails to take into account the fact that Hill needed immediate medical assistance. So stepping away from Hill might have eliminated the safety risk to the paramedics and to Miracle, but it would have had potentially fatal consequences for Hill. Under these circumstances, we conclude that some degree of force on the part of Miracle was reasonably necessary to protect the paramedics and, more importantly, to save Hill's life.

■■■ We turn now to the final factor—whether or not Miracle's single use of a taser in drive-stun mode was excessive under the circumstances. Hill first argues that Miracle should have tried to handcuff or restrain Hill before deploying the taser, and that failing to do so was violative of Hill's Fourth Amendment rights. In support of this argument, Hill points out that the officers in *Caie* attempted to handcuff Caie and encountered resistance before tasing him. But in the present situation where four paramedics were unable to restrain Hill, we are hard-pressed to fault Miracle for not joining the fray.

Hill also argues that the use of a taser in drive-stun mode is "not recommended" and therefore excessive. He fails to acknowledge, however, that this mode is discouraged because of the difficulty in keeping the taser in contact with a person's skin, not because such use constitutes excessive force. Miracle in fact testified that he used his taser in drive-stun mode because this was the best option to "minimize [the] damage" in light of Hill's medical emergency.

We are not holding that a law-enforcement officer is always justified in using a taser to gain control over a person suffering from a medical emergency. But under the circumstances, Miracle's use of force was objectively reasonable. Four paramedics were unable to physically restrain Hill, whose health was rapidly deteriorating and who was unresponsive to Miracle's command to "relax." We conclude that a reasonable officer on the scene, without "the 20/20 vision of hindsight," would be justified in taking the same actions as Miracle. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

This court in *Caie* reached a similar conclusion, holding that using a taser in drive-stun mode was not violative of Caie's

constitutional rights when it "served the purpose of gaining control over a highly intoxicated, volatile, and uncooperative subject and neutralizing what a reasonable officer could perceive as a dangerous situation." *Caie*, 485 Fed.Appx. at 97. Miracle was also faced with a dangerous situation and his actions could similarly be viewed as "objectively reasonable in light of the facts and circumstances confronting [him]." *See Graham*, 490 U.S. at 397, 109 S.Ct. 1865 (internal quotation marks omitted). No reasonable jury could find otherwise based on the facts as viewed in the light most favorable to Hill. Miracle is therefore entitled to qualified immunity on Hill's § 1983 claim of excessive force.

### 2. *Hill's Fourth Amendment right was not clearly established.*

■■■■ Our holding that Miracle did not violate Hill's Fourth Amendment rights leaves no doubt that Hill's § 1983 excessive-force claim also fails to show that the alleged right was clearly established. In order for a right to be clearly established for the purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). This inquiry must be undertaken "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). That is, "[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

■■■■ At the time of the alleged violation, no reasonable officer would have known that using a taser on an individual who was undergoing a medical emergen-cy, posed a risk to the responders' safety, and needed to be subdued in order for medical personnel to render life-saving assistance violated that person's constitutional rights. In other words, Hill has not pointed us to any caselaw that demonstrates a "prior articulation of a prohibition" against the type of force exerted against him. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) ("To demonstrate that the Officers unreasonably violated a clearly established right, the Plaintiffs must therefore show the prior articulation of a prohibition against the type of excess force exerted here.").

A review of qualified-immunity cases dealing with excessive force in the context of taser use shows that this area is one in which "the result depends very much on the facts of each case." *Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). Because no caselaw "squarely governs the case here," *see id.* Miracle's actions in June 2013 do not support a finding of excessive force. So Miracle would be entitled to qualified immunity under either prong of the test set forth in *Kent v. Oakland County*, 810 F.3d 384, 390 (6th Cir. 2016).

### C. Miracle's governmental-immunity defense

■■■■ The other issue on appeal concerns the district court's holding with respect to Hill's state-law claim for assault and battery. Under Michigan law, "[a]n assault is defined as any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 189 Mich.App. 110, 472 N.W.2d 16, 21

(1991). "A battery is the willful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.* Miracle argues that the court erred in concluding that he was not entitled to governmental immunity with respect to Hill's assault-and-battery claim.

As metaphorically noted above, the district court failed to see the forest for the trees in the qualified-immunity context. In the governmental-immunity context under Michigan law, the court failed to even see the trees. We say this because the court applied the wrong standard in assessing Miracle's governmental-immunity defense. It applied the standard set forth in *Brewer v. Perrin*, 132 Mich.App. 520, 349 N.W.2d 198, 202 (1984), stating that "a governmental officer's actions that would normally constitute intentional torts are shielded from liability if those actions are justified because they were objectively reasonable under the circumstances." *Estate of Corey Hill*, 2016 WL 3136066, at *6. But the Michigan Supreme Court repudiated this standard in *Odom v. Wayne County*, 482 Mich. 459, 760 N.W.2d 217 (2008). In *Odom*, the Court noted that the area of law dealing with governmental immunity had "fallen into disarray" and sought to clarify the contours of the defense for intentional-tort claims. *Id.* at 220.

■ The Michigan Supreme Court in *Odom* held that a defendant did not need to show that his actions were "justified" or "objectively reasonable under the circumstances" in order to qualify for governmental immunity. *Id.* at 220, 229. Instead, an officer who commits an intentional tort is entitled to governmental immunity if he shows that "(a) the acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority, (b) the acts were undertaken in good faith, or were not undertaken with malice, and (c) the acts were discretionary, as opposed to ministerial." *Id.* at 228.

We can again understand how the district court might have been led astray by a number of cases decided after *Odom*, particularly arising out of the federal district courts in Michigan, that continue to cite and apply the standard for governmental immunity articulated in *Brewer. See, e.g., Parchman v. Taylor*, No. 12-CV-13094, 2015 WL 265069, at *5 (E.D. Mich. Jan 21, 2015). Unfortunately, neither party was helpful in pointing the court to *Odom* and instead just discussed *Brewer*. But both sides conceded at oral argument before us (in response to our pointed inquiry) that *Odom* is the controlling authority.

Under these circumstances, we would ordinarily remand the case for the district court to reconsider the governmental-immunity defense under the proper standard. *See Pullman–Standard v. Swint*, 456 U.S. 273, 291, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (holding that "[w]hen an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings"). But such a remand would be a waste of judicial resources in the present case. For the same reasons set forth above in the context of Miracle's qualified-immunity defense, we conclude that no reasonable jury would find that he acted in bad faith, much less that malice was a factor. *See id.* at 292, 102 S.Ct. 1781 (holding that, even where the district court's "findings are infirm because of an erroneous view of the law," a remand is unnecessary if "the record permits only one resolution of the factual issue").

 The record here reflects that Miracle acted in an objectively reasonable manner with the minimum force necessary to bring Hill under control, and his actions enabled the paramedics to save Hill's life. Miracle is therefore entitled to governmental immunity on Hill's state-law claim of assault and battery.

### III. CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to dismiss the complaint with prejudice.