**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0486n.06

No. 16-1781

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Aug 22, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SHANNON ROTH, | ) | |
| | ) | |
| Plaintiff – Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| MATTHEW VIVIANO, Hazel Park Police Officer, | ) | |
| | ) | |
| Defendant – Appellee. | ) | |

Before: BATCHELDER, ROGERS, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** In this § 1983 suit alleging excessive force, deprivation of liberty without due process,[1] and Michigan state-law claims of assault and battery, the district court granted summary judgment on the federal claims on qualified immunity grounds and declined to exercise supplemental jurisdiction over the state-law claims. We AFFIRM.

**I.**

At about 3:00 AM on November 8, 2013, Plaintiff Shannon Roth suffered a seizure while sleeping in the home she shared with her husband, Ralph Roth, Jr., and her son, Franklin Laurence Saxton II. Roth and her husband were asleep when Roth "started shaking[.]" PID 82. Awakened by his wife's shaking, Ralph woke Saxton. Saxton observed his mother having a seizure, made sure she was not choking on her tongue, and "rolled her over to her side[.]" *Id.*

---

[1] Roth acknowledged in her response to Viviano's motion for summary judgment that her due process claim must be analyzed under the Fourth Amendment. PID 170.

Ralph "tried calling 911" but he "couldn't figure it out" because he had trouble working his phone. PID 82. Instead, he called the police department. EMTs were also notified.

Officer Viviano arrived first. Viviano testified on deposition that a police officer generally accompanies an ambulance for calls to an individual home or residence within the city of Hazel Park, "[j]ust in case the ambulance needs any assistance." PID 116. Viviano has no medical training aside from basic first aid.

Once in the Roths' bedroom, Viviano asked several times if Roth was on any drugs. Ralph responded that his wife did not do drugs, by which he meant she did not do illegal drugs. Viviano also asked if Roth had ever had a drug problem and looked through the prescription vials that were on her dresser. Viviano picked up Roth's blood pressure medication, looked at it, and asked Ralph if she was on any other medication. The paramedics arrived about five minutes after Viviano.

Before the paramedics arrived, Ralph was on the bed holding Roth to keep her from "banging her head or anything . . ." PID 83. The paramedics told him to stand up, and he did. Ralph moved to the hallway outside the bedroom and Viviano then escorted him out of the house.

The paramedics did not bring a stretcher into the house, leaving the stretcher at the bottom of the steps on the porch. Ralph testified that the paramedics brought in no medical equipment and did not check Roth's vital signs. Saxton "was by [Shannon's] side from the beginning to the end." PID 102.

In the meantime, Roth's eyes remained open but she did not respond to the paramedics' attempts to communicate with her. According to Saxton, Roth "was freaking out" and "didn't know what was going on." Saxton acknowledged his mother was "fighting or resisting" when

2

the paramedics attempted to pick her up. Because "she kept resisting," the paramedics could not carry her out, so Saxton carried her outside himself, ultimately setting Roth on the stretcher. She "didn't know what was going on" and kept screaming for her father, who is deceased.

Once Viviano, Saxton, and Ralph were outside the house, Ralph and Viviano had words and Saxton had to hold his father back to keep him away from Viviano.

Both Ralph and Saxton testified that Roth fell off the stretcher several times, but also testified that she was dropped several times. Viviano testified that he handcuffed Roth to the stretcher and that he was not asked to do so by the EMTs. According to Saxton, Viviano handcuffed Roth to the stretcher after she fell a second time; according to Ralph, Viviano handcuffed her after the first fall, and she was already handcuffed when she fell off the stretcher the second time. Saxton testified that Officer Viviano handcuffed Roth "[f]ace down on the stretcher with her hands behind her back." PID 103.

Viviano testified on deposition that he handcuffed Roth because she was resisting the EMTs; he also testified that she was hostile, punched one responder, and spat at another one. Saxton, who was with Roth throughout the incident, did not testify that he saw his mother punch or spit at anyone, but he was not asked whether she had. Saxton's affidavit reiterates that he was with Roth throughout the incident and avers that he never saw her kick or spit on an EMT.

Although Viviano described Roth as "hostile" in his case report, his report did not mention that she hit or spat at anyone. Viviano testified that he handcuffed one of Roth's hands to the railing of the stretcher because she kept trying to get off the stretcher. Eventually, other personnel secured her to the stretcher using straps. Viviano testified that he kept Roth in a handcuff in order to keep her from removing the straps. The handcuff was removed when Roth arrived at the hospital.

3

In the meantime, other police officers had arrived at the Roth home.  An officer — not Viviano — spoke to Ralph, who was "freaking out," and told Ralph "if he didn't relax, they were going to take him to jail."  PID 103.

Only Saxton rode to the hospital in the ambulance with his mother.  Roth remained handcuffed throughout the trip.  Saxton noted that no one checked her vitals.  Saxton testified that once the ambulance arrived at the hospital, Roth was taken in, and Saxton returned home.

Ralph followed the ambulance and was "still irate" when he arrived at the hospital and again encountered Viviano.  Viviano told Ralph that he needed to calm down and refused to let Ralph into the hospital.

Roth asserts she suffered an injury to her wrist from the handcuffs, and bruises to her feet from kicking the stretcher while she "was seizing."  PID 137.  About a month after the incident, Roth reported "shooting pain through [her] arm" that was so painful she could not sweep or vacuum her floors.  PID 135.  Roth testified that, before this incident, she had no injuries to her wrist.  Medical records show that x-rays and a CAT scan revealed that Roth suffered ligament damage to her wrist that may require surgery to repair.

**II.**

Viviano's motion for summary judgment maintained that he was acting as a medical responder, and that the right to be free from seizure by a medical provider was not clearly established at the time of this incident.

The district court rejected Viviano's argument that Plaintiff was unconscious and she thus could not have been seized within the meaning of the Fourth Amendment:  "the court cannot conclude as a matter of law that Plaintiff, even though without question incoherent and uncommunicative, was also 'unconscious' during the alleged seizure."  PID 282.  However, the

district court determined that, assuming Viviano seized Plaintiff, his actions were objectively reasonable, since there "is no genuine issue of material fact about Plaintiff resisting the helping efforts of the responders, or whether she posed a threat to, among others herself." PID 285. The district court additionally concluded that even if Viviano's actions were unreasonable, he was entitled to qualified immunity because "a right to be free from unintentional conduct by medical-emergency responders under the Fourth Amendment is not clearly established." *Id.*

Roth argues on appeal that the district court misinterpreted *McKenna v. Edgell*, 617 F.3d 432 (6th Cir. 2010), and that Viviano's actions were not objectively reasonable.

**A.**

We determined in *McKenna* that "whether the officers were entitled to qualified immunity depends on whether they acted in a law-enforcement capacity or in an emergency-medical-response capacity when engaging in the conduct that McKenna claimed violated the Fourth Amendment." 617 F.3d at 439. In this case, if Viviano acted as a medical-emergency responder, Roth's claim would be that she "received dangerously negligent and invasive medical care." *Id.* at 440. Because there is no clearly established right to be free from such conduct, a defendant acting as a medical-emergency responder would be entitled to qualified immunity defense. The question whether an officer acted in a law enforcement or medical-response capacity "is an objective inquiry" that depends on the officer's actions — not his intent. *Id.*

In *McKenna*, the plaintiff's fourteen-year-old daughter called 911 and said her father may be having a seizure or choking. Two police officers were dispatched and arrived before firefighter emergency personnel. What happened after the officers entered McKenna's bedroom was disputed. McKenna's daughter testified that the officers instructed her father to get out of bed and get dressed and that her father started to do so, but then sat back down. The officers

then pulled McKenna up and told him to put his pants on; McKenna sat down again and told the officers to stop. The officers continued trying to get McKenna out of bed and finally rolled him over, pinned him on his stomach, and handcuffed his wrists behind his back and his ankles, at which point McKenna began struggling. The officers' testimony differed—they testified that McKenna became aggressive and violent right after they tried to rouse him and that handcuffing him was necessary because of his violent behavior. Like Roth, McKenna had no recollection of the incident. After McKenna was taken to the hospital, the officers searched his dresser drawer and medicine cabinet. Following a trial in 2008, the jury awarded McKenna $6,000 (medical) and $275,000 (pain and suffering). The district court denied the defense's jnov motion but granted its motion for remittitur, reducing pain and suffering damages to $10,000. *Id.* at 437.

The officers appealed the district court's denial of their two summary-judgment motions and post-trial jnov motion—all on the qualified immunity issue. A divided panel of this court affirmed:

> [W]e must determine whether there existed any set of facts under which a reasonable jury could have found that, objectively, the officers acted in a law-enforcement capacity. We conduct that inquiry with respect to the two alleged violations . . . the unreasonable seizure of McKenna's person and the unreasonable search of his home, and find sufficient evidence to support both. We also hold that even if the question of the officers' objective role is viewed as a question for the judge and not the jury, qualified immunity still does not apply. On the most plaintiff-friendly view of the facts that could have been found by the jury, we too conclude that the officers acted in a law-enforcement capacity.
>  . . . .
> [W]hether the officers acted as law enforcement or as medical responders is an objective inquiry . . . . It is not relevant, therefore, whether [the individual defendant police officers] had a law-enforcement or a medical-response intent; the focus must be on what role their actions reveal them to have played.
>
> The issue is then whether this objective determination of the role that the officers played at McKenna's home is for the jury or for the court. We hold that it is properly a jury question because "the legal question of immunity is completely dependent upon which view of the disputed facts is accepted by the jury" . . . . The objective character of what role the officers played depends on what actually

6

happened . . . and on what a medical-emergency responder would have done under the circumstances. The jury heard testimony on both of these factual issues . . . .

Like the district court, we fail to see how it serves any medical-emergency-responder purpose to persist in insisting that a medically seizing individual put on his pants. Questioning [McKenna's daughter] about [his] possible drug use, meanwhile, is equally suggestive of an inquiry into the cause of McKenna's medical condition and of an investigation into wrongdoing. It looks more like the latter, however, given that the officer also asked [McKenna's daughter] about domestic violence. Even so, alone, these questions would make for a very close case. They are more consistent with law-enforcement behavior, however, when viewed against what happened next: the officers handled, subdued, and handcuffed McKenna at the hands and feet without any sign of violence on his part . . .

The search conduct is consistent with this law-enforcement posture. Under ordinary circumstances, the officers' search reasonably would be consistent with a quest for clues about McKenna's medical condition, information that would be valuable to his treatment. But coming immediately after the officers handcuffed McKenna without cause instead of letting the medical seizure run its course, the search looks investigatory . . . .

Finally, after all of this, the officers ran a check on McKenna's license plate .... Certainly there is no self-evident medical-responder valence to such a search.
. . . .
The record contained ample evidence to support the determination that the officers unreasonably searched the home and seized McKenna . . . both actions violated clearly established constitutional rights, and the denial of qualified immunity was appropriate.

*McKenna*, 617 F.3d at 443–45.

**B.**

There are some similarities between the plaintiffs in *McKenna* and Roth. Both were experiencing seizures when police arrived. 617 F.3d at 435. In both cases, officers asked about the seizing individual's drug use. *Id.* In *McKenna*, officers searched the house for drugs or medications. 617 F.3d at 436. As the court noted in *McKenna*, a search for drugs or medications when a responding officer suspects an overdose can be equally suggestive of a medical purpose as of an investigatory one. *Id.* at 444.

7

The different circumstances suggest that, at the least, the officers' conduct in *McKenna* more clearly served a law-enforcement purpose than Viviano's interactions with Roth. First, a jury could have found that the officers handcuffed McKenna before he became violent or aggressive. *McKenna*, 617 F.3d at 444. In contrast, Saxton, Roth's son, acknowledged that Roth was "fighting or resisting" when the paramedics attempted to pick her up. On the other hand, she was clearly suffering a seizure, and was not purposefully uncooperative. It was not until Roth fell off the stretcher at least once that Officer Viviano handcuffed her to the stretcher's railing. Viviano maintained it was necessary to keep Roth handcuffed to the railing — even after the responders secured her to the stretcher with the cross-body straps — so that she could not undo the straps that kept her in place. However, the EMT responders never asked that Roth be cuffed, and it is unclear how cuffing one hand to the stretcher, if that is indeed what Viviano did, would prevent Roth from undoing the straps with her other hand if she was in fact able to move her arms at all at that point.

Further, Saxton testified that Roth was placed on the stretcher face-down, with her hands cuffed behind her, which contradicts Viviano's testimony. Next, although Ralph and Saxton testified that Viviano persisted in asking questions about Roth's drug use, unlike the officers in *McKenna*, nothing in the record suggests that Viviano searched the house for drugs after the ambulance took Roth to the hospital or that he ran her plates.

This is a closer case than *McKenna*. First, McKenna showed no signs of violence before officers restrained him, but Roth was resisting the paramedics' attempts to help her. The handcuffing arguably served a medical-treatment purpose by keeping Roth from loosening or undoing the straps that held her to the stretcher so that she could safely ride by ambulance to the hospital. On the other hand, the EMT responders did not ask that Roth be handcuffed; there is a

8

dispute regarding how she was cuffed, and the rationale for keeping her cuffed after the straps were secured is unclear.

Second, Viviano looked through Roth's pills and inquired about potential drug use, which the *McKenna* court noted could be suggestive of action by a medical responder or law enforcement, but did not inquire about any other criminal activity. In contrast, the officers in *McKenna* asked not only about drug use but also domestic violence — a line of questioning more strongly indicative of an investigatory approach.

Lastly, Viviano looked through only the medications that were on top of Roth's dresser; he did not search through her dresser or medicine cabinet like the officers in *McKenna* did Ralph's description of the scene — that Viviano inspected one of the medications and asked if she was on any other pills — suggests a medical purpose rather than an investigatory one. Further, Viviano did not continue searching after Roth left in the ambulance unlike the officers in *McKenna*. That he conducted his search shortly after arriving on the scene, ostensibly to determine what medications she may have been taking, supports that he was acting as a medical responder.

In light of the foregoing, we assume without deciding that there was a genuine issue of disputed fact regarding whether Viviano was acting in a law-enforcement capacity or in an emergency-medical-response capacity.

### III.

The Fourth Amendment's "objective reasonableness" standard guides the analysis for claims of excessive force. *Graham v. Connor*, 490 U.S. 386, 386 (1989). In determining whether a seizure is reasonable, the court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at

stake." *Id.* at 396 (quotations omitted). Application of the standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The "objective reasonableness" standard "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

**A.**

The district court rejected Viviano's argument that Roth was not subjected to a seizure within the meaning of the Fourth Amendment because she was unconscious at the time of the encounter. Viviano relied on Sixth Circuit precedent suggesting that an unconscious, non-communicative plaintiff cannot allege a Fourth Amendment violation. *Peete v. Metro Gov't of Nashville & Davidson Cty.*, 486 F.3d 217, 222 (6th Cir. 2007). The district court rejected this argument because the record suggested that Roth was conscious even if she was not acting coherently.

Nonetheless, the district court concluded that Viviano acted reasonably under the circumstances because Roth posed a threat to herself by resisting attempts by others to provide assistance during a medical emergency.

During the pendency of this appeal and after argument, we addressed the situation in which the "objective reasonableness" standard of *Graham*, 490 U.S. 386, does not fit "because the person in question has not committed a crime, is not resisting arrest, and is not directly threatening the officer." *Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017). "[W]e suggest that a more tailored set of factors [than *Graham*'s] be considered in the medical-

emergency context, always aimed towards the ultimate goal of determining 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'" *Id.* (quoting *Graham*, 490 U.S. at 397). Accordingly, we held in *Estate of Hill* that a three-part test applies to determine whether an officer in a medical-emergency situation is entitled to qualified immunity:

> (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others?
> (2) Was some degree of force reasonably necessary to ameliorate the immediate threat?
> (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?

> If the answers to the first two questions are "yes," and the answer to the third question is "no," then the officer is entitled to qualified immunity. These questions and answers serve as a guide to assist the court in resolving the ultimate issue of "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them." [*Graham*, 490 U.S. at 397.] The factors that we establish and apply today are, like the *Graham* factors, non-exhaustive, *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007), and not necessarily dispositive in every case. Nonetheless, these additional considerations aid the ultimate inquiry of "whether the totality of the circumstances justified a particular sort of ... seizure," *Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S. Ct. 1694, 85 L. Ed. 2d 1, (1985), and should be considered and ruled upon by the court for claims of excessive force arising in this context.

*Estate of Hill*, 853 F.3d at 314.

In the instant case, the answer to *Estate of Hill*'s first two questions is yes. The parties do not dispute that Roth was experiencing a medical emergency and was incapable of rational decision making due to her seizure. Nor do the parties dispute that some type of force was necessary to prevent Roth from hurting herself, or others. Saxton acknowledged on deposition that Roth was "fighting or resisting" when paramedics attempted to pick her up and, as a result, they could not carry her out of the house. PID 102. After Saxton carried Roth out of the house,

she fell off the stretcher twice. When asked why she fell, Saxton responded that, "she was unaware of what was going on and was freaking out so she tried to fight [being put on the stretcher]. She didn't want to go." PID 103. Viviano described Roth as hostile in his deposition and in his case report. He testified that he handcuffed her to the stretcher's handrail to prevent her from removing the straps that kept her secured to the stretcher.

Roth argues that granting summary judgment was improper because there is an issue of material fact whether she punched or kicked one responder and spat at another. Saxton, who was within eyesight of his mother at all times, affirmed that he never saw her hit or spit at any responder. In his deposition, Viviano reported that Roth punched one responder and spat at another. However, even assuming that Roth did not punch or spit, and that if she did, it was unintentional, it is still undisputed that Roth resisted attempts by the responders to provide medical treatment. As discussed, Saxton testified that Roth was "fighting or resisting" during attempts by responders to carry her out of the house, and that once outside the house, she continued to resist their attempts to provide medical assistance.

Thus, as the district court determined, the dispute between Viviano and Saxton regarding whether Roth hit or spat at the responders does not constitute a genuine issue of material fact because their accounts of Roth's overall response to the responders are consistent. Both agree that she fought or resisted when responders attempted to provide her with medical treatment.

Regarding the third *Estate of Hill* question, whether the force used was reasonable, the parties disagree whether the manner in which Roth was cuffed was reasonable. However, there is no testimony or evidence that cuffing her in either manner was not reasonable. There is no testimony from the EMT responders, for instance, that the straps would have adequately secured

Roth had the cuff been removed, or that the cuffs interfered with Roth's medical treatment or were unnecessary to allow the EMTs to render aid.

Accordingly, on this record, the district court properly determined that Viviano's actions were objectively reasonable as a matter of law and, applying *Estate of Hill*, we must AFFIRM the district court's grant of summary judgment to Viviano on Roth's Fourth Amendment claims on the basis of qualified immunity.

**ALICE M. BATCHELDER, Circuit Judge, concurring in the result.** I concur in the result, but I write separately to explain that Officer Viviano is entitled to qualified immunity because the facts, taken in the light most favorable to Plaintiff Shannon Roth, demonstrate that he was acting as a medical responder and the right to be free of unreasonable seizure by a medical responder was not clearly established at the time of this incident.

In my view, Roth has not shown that the facts in dispute are material to the issue of whether Viviano acted as a medical responder or law enforcement officer. *McKenna v. Edgell*, 617 F.3d 432 (6th Cir. 2010), discusses several factors that help a court to differentiate a medical responder from a law enforcement officer in these circumstances. Applying *McKenna* to the Roth's portrayal of the facts demonstrates that, although Roth takes umbrage at Viviano's tone and mannerisms, Viviano was acting as a medical responder. Roth has presented no evidence that handcuffing a person, who is experiencing a seizure and presents a risk of harming herself, facedown with her hands behind her back indicates that Viviano was acting as a law enforcement officer rather than as a medical responder (however objectionable such conduct may seem in these circumstances). Therefore, because Viviano was acting as a medical responder—and the right to be free of unreasonable seizure by a medical responder was not clearly established at the time of the incident—Viviano is entitled to qualified immunity.