**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 20a0031n.06**

**No. 18-5480**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ESTATE OF DUSTIN BARNWELL, | ) | **FILED**<br>Jan 21, 2020<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MITCHELL GRIGSBY; RICHARD | ) | COURT FOR THE EASTERN |
| STOOKSBURY; DAVID RANDLE; ROBERT | ) | DISTRICT OF TENNESSEE |
| COOKER, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: MERRITT, GIBBONS, and NALBANDIAN, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** On November 11, 2011, Dustin Barnwell took eight prescription muscle relaxant pills and lost consciousness. Barnwell's girlfriend, Shasta Gilmore, called 911 to report that Barnwell was possibly overdosing and trying to fight her. Two police officers and four paramedics responded to the call. The officers held Barnwell down while the paramedics treated him. Pursuant to their intubation protocols, the paramedics administered a series of drugs, including a paralytic called succinylcholine. After the paramedics intubated him, Barnwell was transported to the hospital and died soon after.

Gilmore, on behalf of Barnwell's estate, sued the paramedics, officers, and Roane County, Tennessee. Her complaint alleged federal claims under 42 U.S.C. §§ 1983 and 1985, health care liability claims, and state-law battery claims. The district court dismissed each of Gilmore's claims

at various stages of the litigation, culminating in the entry of judgment as a matter of law in favor of the defendants after three days of trial.

On appeal, Gilmore challenges the district court's grant of summary judgment in favor of the defendants on her § 1983 unlawful-restraint claim and related state-law battery claim; dismissal of her health care liability claim for failure to comply with statutory filing requirements; and grant of judgment as a matter of law in favor of the defendants on her § 1983 excessive-force claim and related state-law battery claim. Gilmore also raises Fifth Amendment and Seventh Amendment claims on appeal. For the following reasons, we affirm.

I.

A.

On November 11, 2011, Barnwell, Gilmore, and their daughter visited Barnwell's friend, Aaron Sweat, around 4:30 or 5:00 p.m. Sweat gave Barnwell Flexeril pills (cyclobenzaprine hydrochloride), a prescription muscle relaxant. Barnwell took the pills and later collapsed on his couch, having lost consciousness. When Gilmore could not wake Barnwell, she grew concerned that he had overdosed. Gilmore contacted her mother, Cherry Turner, and Sweat for help. According to Sweat, Barnwell started kicking him and became combative when Sweat tried to wake him. Turner confirmed as much in her signed statement to the police, noting that Barnwell was kicking and trying to bite them.

A few minutes after 8:00 p.m., Gilmore called 911. She told the dispatcher that Barnwell had taken Flexeril. Gilmore emphasized Barnwell's combative behavior to the dispatcher and noted that he kept trying to fight her.

Officers Mitch Grigsby and Richard Stooksbury were the first of the defendants to respond. Gilmore informed Grigsby and Stooksbury that Barnwell had obtained eight Flexeril pills earlier

that day and passed out around 7:00 p.m. She warned them both that Barnwell was very combative. Stooksbury tried to wake Barnwell verbally and, when that failed, by shaking his foot.

The parties recount what happened next differently.

Grigsby and Stooksbury attested that Barnwell woke up and immediately started kicking Stooksbury. The officers tried to control Barnwell using "soft-arm techniques" on his arms and legs. DE 99-5, Stooksbury Aff., Page ID 597. Barnwell continued to be combative, tried to bite the officers and Turner, and refused to tell them what drugs he took. After Barnwell cycled in and out of consciousness several times, Stooksbury and Grigsby put Barnwell on the floor facedown and held him there until the paramedics arrived.

Gilmore, on the other hand, testified that the two officers were pushing Barnwell down on the couch and slamming his legs down each time he tried to sit up or move. According to Gilmore, one of the officers grabbed Barnwell's arm and threatened to break it if Barnwell tried to bite him. She recalls Grigsby and Stooksbury being so rough that she asked them to "please stop before [they] kill him." DE 365, Trial Tr. Vol. II, Page ID 9632. The officers then flipped Barnwell off the couch and pinned him to the floor. According to Gilmore, Barnwell did not try to bite, kick, or punch anyone during this time. Despite her 911 call stating Barnwell was combative, Gilmore later backtracked, claiming that she "miscommunicated" Barnwell's combativeness. *Id.* at 9640. In Turner's courtroom testimony, she also denied seeing Barnwell try to bite, kick, spit on, or injure the officers in any way. Her initial statement to the police in 2011, however, told a different story.

Around the time that the officers moved Barnwell to the floor, paramedics David Randle and Mike Myers arrived. Based on Barnwell's "very combative" condition and the need to treat him, Randle and Myers asked the officers to handcuff Barnwell. DE 99-6, Randle Aff., Page ID

694. Shortly thereafter, two more paramedics, Robert Cooker and Mark Carter, joined the fray. The paramedics observed that Barnwell had a highly elevated blood pressure and heart rate and seemingly could not control his movements, including banging his head against the floor. Barnwell's breathing was also irregular. Based on their assessment of Barnwell's condition and what they had discerned from Gilmore, the paramedics' diagnosis was that Barnwell was suffering from an overdose or cerebral hemorrhage.

The paramedics then decided "to place an IV so that [they] could administer medications intended to control [Barnwell's] involuntary movements . . . by causing paralysis and loss of reflexes." *Id.* at Page ID 695. They needed to control Barnwell's movements in order to intubate him to assist with his breathing and heart function. It was at this point that Gilmore recalls Stooksbury turning to her and saying "We're about to knock him out." DE 365, Trial Tr. Vol. II, Page ID 9648. The officers then instructed Gilmore and Turner to go outside while the paramedics continued to treat Barnwell.

The paramedics began the intubation sequence. The Roane County Rapid Sequence Paralysis and Intubation ("RSI") Protocol's "Assessments and Indications" call for RSI on patients who are "[s]everely combative" or those for whom "[all] standard attempts to establish an airway have failed." DE 202-1, RSI Protocol, Page ID 3319. The RSI Protocol involves the administration of multiple drugs for sedation and paralysis, including succinylcholine. Succinylcholine works to paralyze the muscles, including the lungs and diaphragm. A patient who is administered succinylcholine requires assistive ventilations. To perform the RSI, Randle established an IV line, and Cooker administered four drugs in sequence, including 150 milligrams of succinylcholine. Once they achieved paralysis, Randle and Cooker intubated Barnwell—that

is, they placed a tube in his trachea to assist with breathing. By this time, the officers had removed the handcuffs.

Barnwell went into cardiac arrest. The paramedics administered another drug to counter the loss of heart function and started CPR. Randle and Cooker continued to provide CPR while transporting Barnwell to the hospital. During transport, they noticed a brown fluid in the endotracheal tube. The paramedics then removed the tube, placed an oral airway, and manually ventilated Barnwell. When they arrived at the hospital, an emergency room doctor took over. Thirty minutes later, Barnwell died.

According to the autopsy report, the cause of death was Excited Delirium Syndrome[1] ("EDS") associated with cyclobenzaprine overdose. The report noted that Barnwell's underlying heart disease contributed. The supplemental toxicology report indicated cyclobenzaprine in Barnwell's blood at toxic levels. The medical examiner concluded that Barnwell's Flexeril (cyclobenzaprine) overdose led to his EDS state, which ultimately caused his death.

B.

In November 2012, Gilmore filed a complaint in state court, naming two officers, four paramedics, and Roane County as defendants. Based on the officers' restraint of Barnwell and the paramedics' institution of RSI Protocol, Gilmore asserted claims under 42 U.S.C. §§ 1983–1985 and under the Tennessee Health Care Liability Act ("THCLA"), as well as state-law claims for battery. The defendants removed the case to federal court.

In 2013, the defendants moved to dismiss the THCLA claim based on Gilmore's failure to comply with the statutory filing requirements. The defendants moved for summary judgment on

---

[1] EDS generally involves an "altered mental status with severe agitation and combative or assaultive behavior." DE 200-9, Journal Article, Page ID 2689. EDS can be caused by drug toxicity, most often due to methamphetamine or cocaine consumption.

the same basis after Gilmore filed an amended complaint. The district court entered summary judgment in favor of the defendants and dismissed Gilmore's THCLA claim with prejudice.

In 2016, the defendants moved for summary judgment on the remaining claims. The district court granted summary judgment in favor of Grigsby, Stooksbury, and Myers based on qualified immunity and dismissed Gilmore's unlawful-restraint claim against these three defendants. The district court denied qualified immunity to Grigsby, Stooksbury, Cooker, and Randle on the § 1983 excessive-force claim premised on their administering succinylcholine to Barnwell. Roane County and paramedics Myers and Carter were dismissed.[2]

Grigsby, Stooksbury, Cooker, and Randle appealed the 2016 order denying them qualified immunity. A panel of this court dismissed the appeal for lack of jurisdiction because the defendants' arguments relied on their own versions of the facts. *Estate of Barnwell v. Grigsby*, 681 F. App'x 435, 440–42 (6th Cir. 2017).

On remand, only Gilmore's § 1983 excessive-force claim and related state-law battery claim remained.

Trial began on October 3, 2017 and ended on October 6, 2017, after the conclusion of Gilmore's proof. The defendants moved for judgment as a matter of law under Fed. R. Civ. P. 50. Finding insufficient evidence upon which a reasonable jury could find in Gilmore's favor, the district court granted the motion and dismissed the case. On April 10, 2018, the district court denied Gilmore's motion for reconsideration. Gilmore timely appealed.

---

[2] Roane County was not officially dismissed as a party until September 20, 2017. The docket indicates that Roane County was dismissed per the district court's April 9, 2015 order, which granted summary judgment in favor of the County on Gilmore's state-law claims. However, Gilmore's *Monell* claim against the County survived until June 16, 2016, when the district court entered an order granting summary judgment in favor of the County on that claim. In any event, Roane County was no longer a party to this case by the time it went to trial on October 3, 2017.

II.

A.

In its October 25, 2013 order, the district court dismissed Gilmore's THCLA claim against Roane County and paramedics Randle, Cooker, Carter, and Myers. The district court found that Gilmore failed to comply with the statutory requirements for pre-suit notice under Tenn. Code Ann. § 29-26-121 and the filing of a certificate of good faith under Tenn. Code Ann. § 29-26-122. Because Gilmore failed to demonstrate extraordinary cause to excuse such noncompliance, the district court granted the defendants' motion for summary judgment and dismissed Gilmore's THCLA claim with prejudice.[3] The district court later denied Gilmore's motion for reconsideration of its decision.

This court reviews *de novo* a district court's grant of summary judgment. *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We view the record in the light most favorable to and draw all reasonable inferences in favor of the nonmovant. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004).

Gilmore did not sufficiently comply with the THCLA's pre-suit notice requirement. Because failure to comply with this requirement ordinarily results in dismissal without prejudice, however, it is necessary for us to address Gilmore's noncompliance with the statutory requirement

---

[3] The district court's order addressed multiple of the defendants' motions—motion for summary judgment and motions to dismiss—that were pending on overlapping grounds. The district court noted that, in entertaining either the motions to dismiss or the motion for summary judgment, it reached the same conclusion. Further, the district court noted that Tenn. Code Ann. § 29-26-122 mandates dismissal with prejudice for noncompliance with its requirements, so such an order was required here, and, although Tenn. Code Ann. § 29-26-121 does not bar re-filing after a dismissal for noncompliance with the requirements of its section, the applicable statute of limitations had run. *See* Tenn. Code Ann. § 29-26-116(a)(1) (prescribing a one-year limitations period). The district court denied Gilmore's motion for leave to file a limited nonsuit of her THCLA claim for presumably the same reasons.

of filing a certificate of good faith, as well. While the law is less clear as to what standard of compliance will satisfy such requirement, Gilmore's certificates—she filed multiple—fall short and warrant dismissal of her THCLA claim with prejudice.[4] And because Gilmore failed to show extraordinary cause to excuse her noncompliance, we affirm the district court's decision to dismiss her THCLA claim.

### 1. Pre-Suit Notice Requirement

A THCLA plaintiff must provide "written notice of the potential claim to each health care provider that will be a named defendant at least sixty (60) days before the filing of a complaint." Tenn. Code Ann. § 29-26-121(a)(1). The content requirements of the notice include:

(A) The full name and date of birth of the patient whose treatment is at issue;

(B) The name and address of the claimant authorizing the notice and the relationship to the patient, if the notice is not sent by the patient;

(C) The name and address of the attorney sending the notice, if applicable;

(D) A list of the name and address of all providers being sent a notice; and

(E) A HIPAA compliant medical authorization permitting the provider receiving the notice to obtain complete medical records from each other provider being sent a notice.

---

[4] This court recently addressed whether Ohio's similar affidavit of merit requirement applied to a medical malpractice action brought in federal court. *Gallivan v. United States*, 943 F.3d 291, 293 (6th Cir. 2019). In *Gallivan*, this court held that Ohio Rule 10(D)(2), which contains the affidavit of merit requirement, did not apply to a claim of medical negligence under the Federal Tort Claims Act because the Federal Rules of Civil Procedure do not require such an affidavit. *Id.* at 293–94. Following the Supreme Court's two-part analysis in *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010), this court found that (1) the Federal Rules answered the question of whether Gallivan had to file an affidavit and (2) the Federal Rules were valid. *Id.* at 294. Gallivan, therefore, did not need to file a medical affidavit with his complaint. *Id.* Although Tennessee's certificate of good faith requirement is arguably similar to Ohio's affidavit of merit requirement, Gilmore does not raise this argument or otherwise suggest that the requirements under Tenn. Code Ann. §§ 29-26-121 and 29-26-122 are inapplicable in light of the Federal Rules. She has therefore waived the issue of whether these requirements should apply to her THCLA claim. *See Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 944 (11th Cir. 2017) (noting that the plaintiffs "waived their challenge to the district court's application of California's anti-SLAPP statute based on the *Erie* doctrine"); *see also Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1349 (11th Cir. 2018) (distinguishing *Novella* and explaining that the California statute only applied in *Novella* because the plaintiff waived the *Erie* issue).

*Id.* § 29-26-121(a)(2). The complaint itself must include a statement of compliance with the pre-suit notice requirements and must be accompanied by documentation certifying proof of service. *Id.* § 29-26-121(a)(3)–(4), (b). This "statute is very specific about how and when the notice must be sent and the information the notice must contain." *Conrad v. Washington County*, No. 2:11-CV-106, 2012 WL 554462, at *2 (E.D. Tenn. Feb. 21, 2012). The court has discretion to excuse a plaintiff's failure to comply with the pre-suit notice requirements, but "only for extraordinary cause shown." Tenn. Code Ann. § 29-26-121(b).

When the district court dismissed Gilmore's THCLA claim in 2013, Tennessee law required strict compliance with the pre-suit notice requirement. *See Myers v. AMISUB (SFH), Inc.*, 382 S.W.3d 300, 304 (Tenn. 2012) (holding that the pre-suit notice requirement under Tenn. Code Ann. § 29-26-121 was mandatory and not subject to substantial compliance); *Moses v. Dirghangi*, 430 S.W.3d 371, 380–83 (Tenn. Ct. App. 2013) (acknowledging the same). Accordingly, the district court applied a strict-compliance standard and found Gilmore's pre-suit notice lacking.

Since then, however, Tennessee has relaxed its standards regarding the pre-suit notice requirements.[5] Courts will forgive "[n]on-substantive errors and omissions," and substantial compliance will satisfy the statute. *Stevens ex rel. Stevens v. Hickman Cmty. Health Care Servs., Inc.*, 418 S.W.3d 547, 555–56 (Tenn. 2013). In particular, the content requirements of subsections

---

[5] *See, e.g.*, *Bray v. Khuri*, 523 S.W.3d 619, 624 (Tenn. 2017) (holding that plaintiff need not provide the statutorily-required HIPAA-compliant medical authorization when a single health care provider is given pre-suit notice of a health care liability claim); *Thurmond v. Mid-Cumberland Infectious Disease Consultants, PLC*, 433 S.W.3d 512, 520–21 (Tenn. 2014) (holding that failure to file with the complaint an affidavit of the person who had sent pre-suit notice by certified mail is not fatal, if such failure does not prejudice the opposing litigant); *Hamilton v. Abercrombie Radiological Consultants, Inc.*, 487 S.W.3d 114, 118 (Tenn. Ct. App. 2014) (holding that plaintiff's omission of a date on her HIPAA authorization was a "minor shortcoming" and not fatal); *cf. Stevens ex rel. Stevens v. Hickman Cmty. Health Care Servs., Inc.*, 418 S.W.3d 547, 554–56 (Tenn. 2013) (noting that the statute requires substantial compliance and holding plaintiff's HIPPA authorization noncompliant when it failed to satisfy three of the six requirements).

(a)(2), (3), and (4) can be satisfied through substantial compliance. *Arden v. Kozawa*, 466 S.W.3d 758, 763 (Tenn. 2015). Despite less stringent standards for the *contents* of the pre-suit notice, the requirement of pre-suit notice itself is still "'fundamental,' 'mandatory,' and 'not subject to satisfaction by substantial compliance.'" *Thurmond v. Mid-Cumberland Infectious Disease Consultants, PLC*, 433 S.W.3d 512, 519 (Tenn. 2014) (quoting *Myers*, 382 S.W.3d at 309–10). In its later order denying reconsideration, the district court concluded that Gilmore failed to meet the substantial-compliance standard because it found she wholly failed to timely provide pre-suit notice to the individual paramedic defendants.

The issue of whether each defendant received pre-suit notice has grown convoluted throughout this case's extensive procedural history. The district court, in its latest order, and the defendants, on appeal, call it "undisputed" that Gilmore only provided pre-suit notice to Roane County, and not to the individual paramedic defendants. DE 372, Mem. Op. & Order, Page ID 10098; CA6 R.18, Appellee Br., at 36. Yet it is unclear how this came to be so. Gilmore's trial counsel certified in the original complaint that he delivered timely notice personally to Roane County officials, and "via certified mail *to each individual defendant*." DE 1-1, Compl., Page ID 36 (emphasis added). He added that he received a return of receipt "on all but one" of the mailed notices, implying that at least three of the four paramedic defendants properly received notice. *Id.*[6] Nevertheless, Gilmore failed to establish compliance with the notice requirement, such as by providing a certificate of mailing, in violation of § 29-26-121(a)(4).

Regardless of whether Gilmore provided notice to each defendant, it is clear that Gilmore failed to provide HIPAA-compliant medical authorizations to the four paramedic defendants. The

---

[6] In fact, none of the individual paramedic defendants in their motion for summary judgment even challenged their actual receipt of notice. Rather, they argued that Gilmore's pre-suit notice did not comply with certain statutory requirements.

failure to provide a HIPAA-compliant medical authorization is not fatal if the authorization provided is "sufficient to enable defendants to obtain and review a plaintiff's relevant medical records." *Stevens*, 418 S.W.3d at 555; *see also Hamilton v. Abercrombie Radiological Consultants, Inc.*, 487 S.W.3d 114, 122 (Tenn. Ct. App. 2014) (holding that plaintiff's omission of a date on her HIPAA authorization was a "minor shortcoming" and not fatal). Unless there is only one named health care provider defendant, it is essential that the HIPAA authorization identify "the person(s), or class of persons," to whom medical records may be disclosed. 45 C.F.R. § 164.508(c)(1)(iii); *see Bray v. Khuri*, 523 S.W.3d 619, 624 (Tenn. 2017) (holding that a plaintiff need not provide the statutorily required HIPAA-compliant medical authorization when the suit only includes a single health care provider that is given pre-suit notice of a health care liability claim); *Wenzler v. Xiao Yu*, No. W2018-00369-COA-R3-CV, 2018 WL 6077847, at \*11 (Tenn. Ct. App. Nov. 20, 2018) (holding that a HIPAA authorization does not substantially comply when it does not identify any person or class of persons to whom medical records may be disclosed). "[A] name is not required so long as there is specific identification of the entity, person, or class of persons authorized to receive the protected health records." *Rush v. Jackson Surgical Assocs. PA*, No. W2016-01289-COA-R3-CV, 2017 WL 564887, at \*4 (Tenn. Ct. App. Feb. 13, 2017).

Gilmore, in her HIPAA release form, authorized Roane County "and its affiliates, its employees and agents" to release Barnwell's pertinent medical records to "any Roane [County] Agency." DE 48-2, HIPAA Authorization, Page ID 298. Gilmore failed to identify any of the individual paramedic defendants in the HIPAA release. *Bray* does not excuse Gilmore's deficient HIPAA release because, unlike *Bray* which involved only one named health care provider,

Gilmore's suit named multiple health care provider defendants.[7] Gilmore's omission of the paramedic defendants was not a "minor shortcoming" like the omission of a date in *Hamilton*. 487 S.W.3d at 122. She failed to specifically identify the individuals authorized to receive the relevant health records and thus did not substantially comply with the HIPAA release requirement.

Beyond her HIPAA release deficiencies, Gilmore's pre-suit notice failed to comply with several other statutory requirements. Subsection (a)(2)(D) requires that the notice include the names and addresses of each health care provider being sent notice as a named defendant. Gilmore's notice letter does not. Subsections (a)(3)(B) and (a)(4) require that proof of service by certified mail be filed with the complaint, along with an affidavit and copy of the notice. Neither Gilmore's complaint nor her separately-filed certificate of notice include the requisite postal receipt or a copy of the notice letter itself. In fact, Gilmore's amended complaint does not even state its compliance with subsection (a), as required by subsection (b). Subsection (b) also requires filing of the HIPAA authorization form required by subsection (a)(2)(E). While Gilmore provided the HIPAA authorization with her notice letter, she failed to include such documentation in the pleadings. These defects in the aggregate are beyond "[n]on-substantive errors and omissions," and Gilmore's notice falls far shorter than permissible "less-than-perfect compliance." *Stevens*, 418 S.W.3d at 555. Therefore, Gilmore did not satisfy the pre-suit notice requirement under Tenn. Code Ann. § 29-26-121, and the district court correctly dismissed Gilmore's THCLA claim.[8]

---

[7] The THCLA's definition for "health care provider" extends to "technicians . . . employed by a governmental health facility." Tenn. Code Ann. § 29-26-101(a)(2)(D). The paramedic defendants—Randle, Carter, Cooker, and Myers—qualify as such.

[8] To be clear, the district court dismissed her THCLA claim with prejudice. And dismissal without prejudice now would have the practical effect of a dismissal with prejudice because Gilmore's claims are barred by the applicable statute of limitations and statute of repose. *See* Tenn. Code Ann. § 29-26-116(a)(1), (3) (prescribing a one-year limitations period and a three-year repose period).

2. Certificate of Good Faith Requirement

Under the THCLA, a plaintiff bringing a health care liability claim in which expert testimony is required must file a certificate of good faith with the complaint. Tenn. Code Ann. § 29-26-122(a). Failure to file the certificate with the complaint mandates dismissal, with limited exceptions. *Id.* The statute details the content that must be included in the certificate. *See id.* § 29-26-122(a)(1)–(2). Relevant here, the required content includes: (1) a disclosure by the plaintiff of the number of (if any) prior violations of this statutory section by the plaintiff; and (2) a statement that the plaintiff or plaintiff's counsel has consulted with a competent expert who has provided a signed written statement confirming that the expert believes, based on the available medical records, that there is a good faith basis to maintain the action. *Id.* § 29-26-122(a)(1)(A)–(B), (d)(4).

Whether Tennessee requires strict compliance with the good-faith certification requirements of this section—or permits substantial compliance—has been a lingering question in this court. In 2015, we certified the question to the Tennessee Supreme Court. *Eiswert v. United States (Eiswert I)*, 619 F. App'x 483 (6th Cir. 2015). After the Tennessee Supreme Court declined to answer the certified question, this court remanded to the district court for consideration of whether § 29-26-122 permits substantial compliance, in light of intervening cases. *Eiswert v. United States (Eiswert II)*, 639 F. App'x 345 (6th Cir. 2016). On remand, the district court concluded that, based on Tennessee case law and the plain language of the statute, § 29-26-122 "cannot be satisfied by substantial compliance when the plaintiffs fail to file a certificate of good faith along with the complaint." *Eiswert v. United States (Eiswert III)*, 322 F. Supp. 3d 864, 878 (E.D. Tenn. 2018). The district court did not hold that all aspects of this statutory section are subject to strict compliance, but its reasoning supports that assumption until Tennessee courts

resolve this question. *See id.* (noting that, because § 29-26-121 does not provide a penalty for noncompliance and § 29-26-122 does, the court should presume that the Tennessee legislature intended the sections to function under different standards and carry different sanctions). Therefore, we must evaluate whether Gilmore's good-faith certificate strictly complied with the requirements of § 29-26-122.

The first alleged defect in Gilmore's certificate is the nondisclosure of prior violations, if any, of § 29-26-122 by Gilmore or her attorney, as required by subsection (d)(4). In Gilmore's original complaint, the certificate of good faith provided, in its entirety, "I hereby certified [sic] that I have consulted with one or more experts who have provided a written statement that there is a good faith basis to maintain this action." DE 1-1, Compl., Page ID 35. In her amended complaint, Gilmore tacked on the following statement in the certificate of good faith: "I have been found in violation of [Tenn. Code Ann.] § 29-26-122 <u>0</u> prior times." DE 20, Am. Compl., Page ID 162. While the latter certificate satisfies subsection (d)(4) on its face, the former is lacking. But in 2015, the Tennessee Supreme Court held that the statute "does not require disclosure of the absence of any prior violations of the statute." *Davis ex rel. Davis v. Ibach*, 465 S.W.3d 570, 574 (Tenn. 2015) (emphasis omitted).[9] Thus, under current law, Gilmore's nondisclosure of her lack of prior violations in the initial certificate of good faith is not fatal.

The second alleged defect in Gilmore's certificate concerns subsection (a)(1)(A), which requires a statement that an expert has been consulted and has provided a signed written statement confirming that he or she is competent under Tenn. Code Ann. § 29-26-115 to express an opinion in Gilmore's case. Tenn. Code Ann. § 29-26-122(a)(1)(A).

---

[9] The Tennessee Supreme Court reached this conclusion based on statutory interpretation, not substantial compliance. *See Davis*, 465 S.W.3d at 574. We do not read *Davis* as suggesting that Tennessee has adopted a substantial-compliance standard for meeting the requirements of Tenn. Code Ann. § 29-26-122.

It is undisputed that Gilmore's initial complaint was defective with respect to the expert competency statement requirement. Gilmore argues that her amended complaint and second certificate of good faith corrected any defects. Gilmore's amended complaint attempted to add the required statements under Tenn. Code Ann. § 29-26-122(a)(1)(A) and (d)(4). In its 2018 order denying reconsideration, the district court concluded that dismissal was proper because Gilmore's "certificate was and remain[ed] deficient for its failure to strictly comply with § 29-26-122(a)(1)(A), which requires confirmation that the expert consulted is competent to express an opinion in the case." DE 372, Mem. Op. & Order, Page ID 10101. The district court was correct in that, "under the law as it currently stands, failure to include this provision subjects [Gilmore]'s complaint to dismissal with prejudice" because that would not meet the strict-compliance standard. *Id.* While Gilmore's second certificate included a competency statement, the statement and certificate still fell short of the mark. As the district court explained, "[a]lthough [Gilmore]'s amended complaint included a more detailed certificate, counsel failed to check the appropriate subsection to indicate the particular steps that counsel had taken to ensure that the action had a good faith basis." *Id.* at 10100 n.3.[10] This fails to meet strict-compliance muster and justified the district court's dismissal with prejudice, according to the statutory directive. *See* Tenn. Code Ann. § 29-26-122(c).

Gilmore argues that, despite her failure to satisfy the good-faith certificate requirement of Tenn. Code Ann. § 29-26-122, her claim should not have been dismissed for two reasons: (1) Roane County failed to provide copies of medical records; and (2) the "common knowledge" exception applied. Neither of these arguments has merit.

---

[10] Gilmore's second certificate explicitly includes an acknowledgement that "Failure to check item 1 or 2 and/or not signing item 1 or 2 will make this case subject to dismissal with prejudice." DE 20, Am. Compl., Page ID 161. Item 1 or 2 refers to alternative ways to satisfy the requirement for the expert competency statement.

First, Gilmore provides no explanation for how Roane County failed to timely provide copies of Barnwell's autopsy report and other records. She merely states that this exception should apply and faults the "absence of findings of fact" by the district court on this issue. CA6 R. 15, Appellant Br., at 39. The district court did not address this issue because Gilmore did not raise it in the district court. In Gilmore's response to the defendants' motion for summary judgment on her THCLA claims, she did not argue that the exception applied or even mention the provision of medical records. Therefore, she has waived this argument.

Second, the whole of Gilmore's argument for the applicability of the common knowledge exception is that "it is within the common knowledge of a layman that no person should purposefully shut down breathing lungs." *Id.* at 40. Gilmore's expert attested to the same in his affidavit, explaining that "[t]here is no rational theory in the health sciences for paralyzing the lungs" of a man who was able to breathe on his own and that this "is easily within the common knowledge of the ordinary lay person." DE 34, Perlaky Aff., Page ID 208. Outside these conclusory statements, Gilmore provides no explanation of how the alleged negligence in administering succinylcholine to Barnwell falls within the common knowledge of a layperson, such that expert proof would not be required. Indeed, the plaintiff "in most medical negligence cases must provide expert testimony to establish the required elements" of a THCLA claim. *Shipley v. Williams*, 350 S.W.3d 527, 550 (Tenn. 2011). This is because "most medical claims involve complicated and technical information which is beyond the general knowledge of a lay jury." *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 92 (Tenn. 1999). This is not one of the rare cases that "typically involve unusual injuries such as a sponge or needle being left in the patient's abdomen following surgery or where the patient's eye is cut during the performance of an appendectomy." *Id.* As such, the common knowledge exception is inapplicable and cannot

excuse Gilmore's failure to comply with the good-faith certificate requirement of Tenn. Code Ann. § 29-26-122.

### 3. Extraordinary Cause for Noncompliance

The THCLA provides that the court has discretion to excuse a plaintiff's failure to comply with the procedural and filing requirements for extraordinary cause. Tenn. Code Ann. §§ 29-26-121(b), 29-26-122(a). Whether Gilmore demonstrated extraordinary cause is a mixed question of law and fact, and the panel's review of that determination is *de novo* with a presumption of correctness applying only to the trial court's findings of fact and not to the legal effect of those findings. *Myers*, 382 S.W.3d at 307–08 (citing *Starr v. Hill*, 353 S.W.3d 478, 481–82 (Tenn. 2011)). "Tennessee courts have interpreted 'extraordinary cause' as 'going beyond what is usual, regular, common, or customary.'" *Reed v. Speck*, 508 F. App'x 415, 423 (6th Cir. 2012) (quoting *Myers*, 382 S.W.3d at 311). These courts have also "equated 'extraordinary cause' with 'excusable neglect,'" but "forces within a party's control will not substantiate a claim of excusable neglect." *Id.*

Before ruling on the defendants' motions to dismiss and motion for summary judgment on Gilmore's THCLA claims, the district court ordered Gilmore's attorney, John Wolfe, to submit an affidavit demonstrating extraordinary cause to excuse Gilmore's noncompliance with the statutory requirements. Wolfe filed an affidavit that simply restated Gilmore's theories of liability. It did not offer any explanation of why Gilmore's noncompliance with the statutory requirements should be excused.[11] The district court properly concluded that Gilmore failed to demonstrate

---

[11] The only statement in the affidavit that resembles an attempt to show extraordinary cause is Wolfe's assertion that the defendants "have made it difficult to get records or interview witnesses." DE 63, Wolfe Aff., Page ID 418. Gilmore argues on appeal that this non-provision of records should constitute extraordinary cause. What Gilmore never explains, however, is how the availability of such records affected her ability to comply with the pre-suit notice requirement and good-faith certificate requirements of the THCLA.

extraordinary cause, noting that "[i]nstead of providing new information for the Court's consideration, Plaintiff's affidavit merely restates facts and allegations that are already contained in the record." DE 66, Mem. Order, Page ID 447.

We agree with the district court and hold that Gilmore failed to demonstrate extraordinary cause to excuse her noncompliance with the THCLA requirements of pre-suit notice and certificate of good faith. Gilmore has not shown why her noncompliance was due to excusable neglect or something "beyond what is usual, regular, common, or customary." *Reed*, 508 F. App'x at 423. Before the district court dismissed her THCLA claims, Gilmore had ample opportunity to demonstrate extraordinary cause. Yet, her attorney chose to simply restate the theories of liability rather than offer any explanation for noncompliance. Therefore, we affirm the district court's decision to dismiss Gilmore's claims with prejudice.

III.

*A. Section 1983 Claim – Unlawful Restraint*

The district court disposed of Gilmore's § 1983 and state-law battery claims based on unlawful restraint in its June 16, 2016 order granting partial summary judgment to the defendants. The court concluded that Officers Grigsby and Stooksbury and paramedic Myers were entitled to qualified immunity because they were not acting in a law-enforcement capacity and noted that, even if they were, "the tactics used by [them] were objectively reasonable under the circumstances and thus do not rise to the level of a Fourth Amendment violation." DE 250, Mem. & Order, Page ID 4324.

We review a district court's order granting summary judgment *de novo*. *Tysinger*, 463 F.3d at 572. Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. The burden is

on the non-moving party to show that there is "sufficient evidence to create a genuine issue of material fact." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing the grant of summary judgment, "[t]he court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*

Gilmore barely argues the viability of her § 1983 unlawful-restraint claim and related battery claim. Instead, she attacks the district court's treatment of the facts at summary judgment. As explained below, the district court did not improperly view the facts for the purpose of deciding the defendants' motion for summary judgment. Further, the law is clear that the individual defendants are entitled to qualified immunity, regardless of the alleged factual dispute. The viability of Gilmore's battery claim—based on the same conduct as her § 1983 claim—directly depends on the survival of her § 1983 unlawful-restraint claim. Therefore, we affirm the district court's grant of summary judgment and dismissal of her § 1983 unlawful-restraint and related state-law battery claim.

On appeal, Gilmore argues that the district court did not employ the proper standard for summary judgment.[12] In two paragraphs supporting this argument, Gilmore cites only a single case, and it simply stands for the general proposition that "courts may not resolve genuine disputes of fact in favor of the [movant]." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Gilmore argues that the parties propounded "two contrasting versions" of the events surrounding the restraint of

---

[12] In her brief, Gilmore alleges two errors in the district court's grant of summary judgment on her unlawful-restraint claim. One of her arguments, though, was the district court's "bifurcation of the facts" between those giving rise to the unlawful restraint claim and those surrounding the administration of succinylcholine. This argument occupies a single paragraph and includes not a single citation to legal authority. Because the district court appropriately considered those facts *giving rise to* the unlawful-restraint claim, we see no merit in this argument and do not address it further.

Barnwell and that the district court adopted the defendants' version. Gilmore does not explain what these "contrasting versions" are. She quotes a summary of the facts[13] from the district court's order and instructs this court to "[c]ompare this version to that of Gilmore, her mother, and two of Barnwell's friends that is examined in detail above." CA6 R. 15, Appellant Br., at 41–42. Presumably, Gilmore is referring to Turner's and her own statements denying Barnwell's combativeness. We need not address this argument, however, because Gilmore presented no admissible evidence that the defendants acted in a law-enforcement capacity—or with a punitive purpose—when they restrained Barnwell.

As the district court noted in its order denying reconsideration and as Gilmore herself recognizes in her brief, the defendants' entitlement to qualified immunity turns on whether they restrained Barnwell in order to punish or incarcerate him or in order to assist the paramedics in their provision of emergency medical care. This is because "whether the [defendants are] entitled to qualified immunity depends on whether they acted in a law-enforcement capacity or in an emergency-medical-response capacity when engaging in the conduct that" was allegedly violative of Barnwell's constitutional rights. *McKenna v. Edgell*, 617 F.3d 432, 439–40 (6th Cir. 2010). And there is no clearly established right to be free from unintentional, invasive medical care provided by a defendant-officer acting in an emergency-medical-response capacity. *Roth v. Viviano*, 704 F. App'x 548, 551 (6th Cir. 2017).

In *Peete v. Metropolitan Government of Nashville*, the plaintiff brought a § 1983 claim against firefighters and paramedics alleging that they used excessive force in restraining the decedent when responding to a 911 call. 486 F. 3d 217, 219 (6th Cir. 2007). This court noted that

---

[13] The excerpt from the district court's June 16, 2016 order describes the defendants' arrival to Barnwell's house following Gilmore's 911 call. The court noted that the officers found Barnwell "combative" after trying to wake him. The court noted the officers' takedown of Barnwell and Myers's assistance in restraining Barnwell so that he could be handcuffed and treated by the paramedics. DE 250, Mem. & Order, Page ID 4321.

"[t]he result must turn on the *specific purpose*[14] and the particular nature of the conduct alleged in the complaint." *Id.* at 220 (emphasis added). The plaintiff did not present any evidence, or even allege, that the defendants "acted purposely to harm" the decedent. *Id.* This court held that the defendants did not seize the decedent when they restrained him in order to administer emergency medical treatment and thus did not violate clearly established law. *Id.* at 219. To be sure, "where the purpose is to render solicited aid in an emergency rather than to enforce the law, punish, deter, or incarcerate, there is no federal case authority creating a constitutional liability for the negligence, deliberate indifference, and incompetence alleged in the instant case." *Id.* at 221.

Like the defendants in *Peete*, the paramedic and officers who restrained Barnwell "did not unreasonably seize him for the purpose of interfering with his liberty" and "were not acting to enforce the law, deter or incarcerate." *Id.* at 222. Rather, Stooksbury, Grigsby, and Myers held Barnwell down and handcuffed him because he was resisting their attempts to help him in a medical emergency. True, the court in *Peete* noted that the decedent's unconscious state was relevant to the seizure inquiry because he was unaware of any interference with his liberty. *Id.* at 220–21. Central to the *Peete* holding, however, is the lack of a punitive purpose. *Id.*

In *McKenna*, we held that a defendant-officer's entitlement to qualified immunity depends on whether the officer acted in a law-enforcement capacity or emergency-medical response capacity, which is an objective inquiry. 617 F.3d at 439–40 ("It is not relevant . . . whether [the officers] had a law-enforcement or a medical-response intent; the focus must be on what role their actions reveal them to have played.") We also held that this objective characterization of the defendant's role is a jury question. *Id.* at 441.

---

[14] The Sixth Circuit later clarified *Peete*'s holding and explained that determining a defendant's "purpose" must be an objective inquiry. *McKenna*, 617 F.3d at 440. Indeed, the analysis must focus on a defendant's objective function, purpose, or capacity. *Id.*

Even if the question were not reserved for the jury, the *McKenna* court concluded that the defendants were not entitled to qualified immunity because, based on the objective facts, the defendants acted in a law-enforcement capacity. *Id.* at 443. Notably in that case, the defendant-officers (1) restrained the plaintiff despite being "[c]ompletely unprovoked by any aggressive or dangerous behavior," (2) searched the house after the plaintiff was taken to the hospital, (3) ran a check on the plaintiff's vehicle registration, and (4) questioned others present about the plaintiff's possible drug use and domestic violence. *Id.* In its objective analysis of the officers' conduct, the court found that "[a]ll together, their treatment of [the plaintiff] was consistent with their treatment of a criminal suspect." *Id.* at 444. That is to say, the officers acted in a law-enforcement capacity and were thus not entitled to qualified immunity.

Here, however, the evidence clearly indicates that the defendants' conduct served a medical-emergency function, rather than a law-enforcement function. The paramedics requested that Stooksbury and Grigsby place Barnwell in handcuffs so that they could better treat Barnwell. In contrast, the defendants in *Roth* handcuffed the plaintiff even though the plaintiff was already strapped into a stretcher and the paramedics did not ask the officers to handcuff him. 704 F. App'x at 553. Additionally, the defendants in the instant case did not search Barnwell's house, which would be indicative of an investigatory purpose and a "law-enforcement posture." *McKenna*, 617 F.3d at 444. The defendants did inquire repeatedly about Barnwell's drug use, which can be "equally suggestive" of an emergency-medical-assistance function as a law-enforcement function. *Id.* Here, the officers' and paramedic's questions about Barnwell's drug use look more like the former. Unlike the defendants in *McKenna* who responded to a 911 call about a seizure, the defendants in the case at bar were responding to Gilmore's call that specifically indicated Barnwell's possible drug overdose.

While the determination of the capacity in which the defendants acted when restraining Barnwell is a "jury question" according to *McKenna*, the district court did not err in granting summary judgment. Gilmore presented no admissible or probative evidence that the defendants restrained Barnwell for punitive purposes or in a law-enforcement capacity, so there was no genuine dispute as to that critical, material fact. *See Tolan*, 134 S. Ct. at 1863. Gilmore alleges that Cooker *had previously* acted in a punitive manner toward *other* Roane County EMS patients, but that is irrelevant for several reasons. First, Gilmore's unlawful-restraint claim only pertains to the conduct by Stooksbury, Grigsby, and Myers. Second, that allegation does not bear on the purpose of the defendants' conduct in restraining Barnwell on November 11, 2011. Gilmore also proffered evidence of previous interactions between Barnwell and Stooksbury. Her evidence of two such interactions is inadmissible hearsay,[15] and her own recollection of one exchange[16] does not indicate that Stooksbury acted with a punitive purpose in restraining Barnwell on the night in question.

In our analysis of the defendants' conduct pertaining to the restraint of Barnwell, there is no evidence or facts indicating that they acted in a law-enforcement role or with a punitive purpose, and Gilmore's mere speculation is insufficient to create a genuine dispute and withstand summary judgment. Viewing the facts in the light most favorable to Gilmore and drawing reasonable inferences in her favor, the defendants are entitled to qualified immunity, and the district court's decision to grant summary judgment was proper.

---

[15] Gilmore submits Sweat's statements about what Barnwell told him concerning an interaction between Barnwell and Stooksbury while Barnwell was incarcerated. She also submits statements by a former Roane County paramedic, Karen Human, about what Barnwell told her concerning Stooksbury.

[16] Gilmore testified that, two years prior to Barnwell's death, Stooksbury stopped Barnwell's car, pulled his gun on Barnwell and Gilmore, and then let them go.

Because Gilmore's § 1983 unlawful-restraint claim fails, so too must her state-law battery claim arising from the same event. "Where a plaintiff asserts a battery claim under Tennessee law that arises out of the same use of force as her § 1983 excessive-force claim, the analysis is the same for both causes of action." *Griffin v. Hardrick*, 604 F.3d 949, 956 (6th Cir. 2010). That is to say, a defendant entitled to summary judgment on a plaintiff's § 1983 claim is also entitled to summary judgment on the related state-law battery claim. *Id.* at 957. Therefore, we affirm the district court's decision to dismiss both the § 1983 claim and the battery claim based on the defendants' restraint of Barnwell.

### B. Section 1983 Claim – Excessive Force

On the third day of trial, the district court granted judgment as a matter of law and disposed of Gilmore's § 1983 and state-law battery claims based on excessive force through the administration of succinylcholine. The court concluded that Grigsby, Stooksbury, Randle, and Cooker were entitled to judgment as a matter of law because Gilmore did not "produce[] enough evidence within [her] case in chief to support a reasonable finding in [her] favor." DE 366, Trial Tr. Vol. III, Page ID 9987. Specifically, the court noted that Gilmore had offered no proof that Grigsby and Stooksbury played any role in the paramedics' administration of succinylcholine. There was no evidence that the officers asked or ordered the paramedics to give Barnwell the paralytic. The court also found that Gilmore offered no proof that Randle and Cooker—the paramedics who actually administered the drug—were acting in a law-enforcement capacity.

In reviewing a motion for judgment as a matter of law, we employ the same standard as the district court. *Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 469 (6th Cir. 1993) (citing *Hunt v. Coynes Cylinder Co.*, 956 F.2d 1319, 1328 (6th Cir. 1992)). Under this standard, we view the evidence in the light most favorable to the non-moving party, giving that party the benefit of

all reasonable inferences. *Id.* "A motion for a judgment as a matter of law should be granted whenever there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ." *Id.*

As a threshold matter, Gilmore wholly fails to support her appeal of the district court's grant of judgment as a matter of law. Gilmore provides no argument as to why the district court erred, so the panel should deem this issue waived. *See Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 610–11 (6th Cir. 2016) ("To preserve an issue for appellate review, a party is required to address the issue in its appellate briefing."); *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1154–55 (6th Cir. 2010) (holding that an issue not raised in an opening brief is deemed waived); *Middlebrook v. City of Bartlett*, 103 F. App'x 560, 562 (6th Cir. 2004) ("The failure to present an argument in an appellate brief waives appellate review.") (citations omitted). *See also* Fed. R. App. P. 28(a)(8)(A) (requiring a brief's argument to contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

In her principal brief, Gilmore summarily states that "[t]here was excessive force and battery in the administration of a paralytic drug to Barnwell, implicating Officers Stooksbury and Grigsby and EMTs Cooker and Randle." CA6 R. 15, Appellant Br., at 28. That statement constitutes the entirety of her § 1983 excessive-force argument on appeal. In fact, Gilmore's brief does not even include an argument section pertaining to her excessive-force claim. She does not argue that judgment as a matter of law was improper, let alone provide any contentions or citations to authority to support such an argument. Her reply brief does not rectify this fatal mistake.

"[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument

in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (alteration in original) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)).

This is precisely what Gilmore has done with respect to her § 1983 excessive-force claim and related state-law battery claim. Gilmore's single assertion that "[t]here was excessive force and battery in the administration of a paralytic drug to Barnwell" is perfunctory and skeletal, at best. CA6 R. 15, Appellant Br., at 28. After six years of litigation, Gilmore inexplicably omits a central claim in her case and the only claim to actually make it to trial. Because Gilmore has failed to "provide even a modicum of legal argument as to why the district court erred," *Cooper v. Commercial Sav. Bank*, 591 F. App'x 508, 509 (6th Cir. 2015), we deem this issue waived and need not reach the merits.

V.

On appeal, Gilmore claims a violation of her Fifth Amendment due process rights based on the district court's refusal to allow her to testify. At trial, the district court examined Gilmore's ability to speak from the witness stand and determined that she was "unavailable" for purposes of Fed. R. Civ. P. 32. In relevant part, Rule 32 provides that "[a] party may use for any purpose the deposition of a witness, whether or not a party, if the court finds: . . . that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment." Fed. R. Civ. P. 32(a)(4)(C).

We review a district court's unavailability determination under Fed. R. Civ. P. 32 for abuse of discretion. *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 154 (6th Cir. 1996). Deference is the hallmark of the abuse-of-discretion standard, and we may not disturb the district court's ruling unless it "was arbitrary, unjustifiable or clearly unreasonable." *Hardyman v. Norfolk & W.*

*Ry. Co.*, 243 F.3d 255, 258, 267 (6th Cir. 2001) (quoting *Plain Dealer Publ'g Co. v. City of Lakewood*, 794 F.2d 1139, 1148 (6th Cir. 1986)).

Gilmore apparently lost her voice on the eve of trial. Yet, instead of requesting a continuance, her attorney proposed the reading of Gilmore's deposition testimony in lieu of live testimony. The district court evaluated Gilmore's ability to speak and found it difficult, if not impossible, to hear her. Gilmore's own attorney submitted that he was "having a hard time hearing what [Gilmore]'s saying." DE 364, Trial Tr. Vol I., Page ID 9554. The district court made an initial determination that Gilmore was "unavailable" under Fed. R. Civ. P. 32, to which Gilmore's attorney did not object. The court delayed the reading of Gilmore's deposition until the next day to provide Gilmore a chance to recover and find her voice.[17] The court explained its decision as follows:

> The Court: Hopefully your voice will be much better and you'll be able to speak clearly enough that we can all hear you. If not, then you will have the choice of entering the deposition testimony . . . . You can go to another witness and hope that her voice recovers before your -- close of your proof.

*Id.* at 9564. And on day 2 of trial:

> The Court: So are we going to begin by reading [Gilmore's] deposition?
> Mr. Wolfe: Yes, Your honor.
> The Court: Okay. So I can explain that to the jury that [Gilmore]'s voice is still fragile and she's not going to be able to testify. Correct?
> Mr. Wolfe: Yes, Your Honor. That's correct.

---

[17] The district court explained as follows:

> On Monday, your own client was late getting here. We had to wait to begin anything until she arrived. Then we had the problem with her voice. We spent a great deal of time . . . discussing what to do because she couldn't testify. I let her try. It was not feasible for her to talk in a way that would produce a record and allow the jury and everybody in this room to understand her. I gave her overnight until Wednesday morning to see if she could possibly talk then.

DE 366, Trial Tr. Vol. III., Page ID 9938.

DE 365, Trial Tr. Vol. II., Page ID 9594–95. Gilmore's other attorney, Whitney Durand, then took the stand and read the agreed-upon portions of Gilmore's deposition testimony. At the close of Gilmore's case-in-chief, Gilmore did not request to testify, as the district court had previously noted it would allow.

On appeal, Gilmore argues that, despite a paucity of authority supporting her position, "the concept of fair play comes into helpful focus when a party seeks to exclude another party from appearing in the courtroom, from testifying, or both." Gilmore cites one Sixth Circuit case and three state supreme court cases which have no bearing on whether Gilmore was denied due process when the district court found her unavailable, as she herself proposed. *See Helminski v. Ayerst Labs.*, 766 F.2d 208, 216–17 (6th Cir. 1985) (holding that exclusion of a litigant from the courtroom must comport with due process); *Kesterson v. Jarrett*, 728 S.E.2d 557, 564 (Ga. 2012) (holding that a child could not be excluded from her own trial unless the opposing party could show waiver, prejudice, or extreme circumstances); *Jordan ex rel. Jordan v. Deery*, 778 N.E.2d 1264, 1272 (Ind. 2002) (same); *Cary ex rel. Cary v. Oneok, Inc.*, 940 P.2d 201, 204 (Okla. 1997) (same). For two obvious reasons, these cases are irrelevant. First, the defendants here did not request a finding of Gilmore's unavailability; she did. Second, the district court did not exclude Gilmore from the courtroom or the witness stand. The district court gave Gilmore ample opportunity to testify, which she repeatedly declined.

We find that the district court did not abuse its discretion in determining—on Gilmore's own motion—that she was unavailable under Fed. R. Civ. P. 32. Thus, Gilmore was not denied her Fifth Amendment right to testify.

VI.

Lastly, Gilmore brings a Seventh Amendment challenge based on the district court's entry of judgment as a matter of law. The Seventh Amendment protects the right of a litigant to a trial by jury, unless his or her claims can be determined as a matter of law. *Rhea v. Massey-Ferguson, Inc.*, 767 F.2d 266, 268–69 (6th Cir. 1985). The grant of judgment as a matter of law before a case is submitted to the jury does not necessarily violate the Seventh Amendment. *See Weisgram v. Marely Co.*, 528 U.S. 440, 449–50 (2000). It will contravene the Seventh Amendment's guarantee of trial by jury only if, after a party has been fully heard, there remains a legally sufficient basis for a jury to find for the party on that issue. *Id.*

After three days of trial, the district court found that the defendants' entitlement to qualified immunity resolved the ultimate issue in the case: whether administration of succinylcholine to Barnwell constituted constitutionally-impermissible excessive force. The district court properly viewed the evidence in the light most favorable to Gilmore and found that there was no legally sufficient basis for a reasonable jury to find for Gilmore on the ultimate issue in the case. Therefore, we find no violation of Gilmore's Seventh Amendment right to trial by jury.

VII.

For the foregoing reasons, we affirm.